PICKETT, Judge.
h Mary Granger appeals a judgment of the workers’ compensation judge (WCJ) finding that she failed to prove that her husband, Jimmie Granger, was in the course and scope of his employment when he died, and therefore denying benefits.

FACTS

On the morning of July 8, 2010, Jimmie Granger was welding on lands owned by B & B Farms of Mamou, Inc. Tragically, Jimmie was discovered dead, electrocuted while welding on a metal pole. A metal pole was found near Jimmie’s body. Jimmie and Mitch Broussard operated M & J Crawfish, which engaged in crawfish farming on lands, including the acreage owned by B & B Farms in this case. A workers’ compensation claim was filed on behalf of Mary, Jimmie’s surviving spouse, and their minor child, against B & B Farms and its insurer, Louisiana Workers’ Compensation Corporation (LWCC). Resolution of the workers’ compensation claim turned on the activity being performed by Jimmie at the time of his death and on the nature of the relationship between B & B Farms and M & J Crawfish.
The evidence showed that on the morning of Jimmie’s death, he was welding metal poles for duck houses he intended to place at his home. He stopped welding, had a brief conversation with Mitch, and then returned to welding. Soon thereafter, Mitch noticed Jimmie lying on the ground. When Mitch got to Jimmie and tried to touch him, he felt a charge of electricity. Mitch turned the welding machine off and tried to resuscitate Jimmie, but was unsuccessful. In Mary’s workers’ compensation case, she alleged that Jimmie was welding a canopy for a tractor owned by B & B Farms at the time of his death. The WCJ heard testimony | gfrom Mitch, Mary, Larry Broussard (Mitch’s father and the co-owner of B & B Farms), and Lisa Huffty, LWCC’s adjuster. The WCJ found that the evidence presented failed to prove by a preponderance of the evidence that Jimmie was working on Larry’s tractor at the time of his death. Mary now appeals that judgment.

*1147
ASSIGNMENTS OF ERROR

On appeal, Mary asserts three assignments of error:
1. The WCJ erred in finding the relationship between B & B and M & J Crawfish was one of lessor and lessee;
2. The WCJ erred in finding Jimmie was working on a wood duck house at the time of his death; and
3. The WCJ erred in finding Jimmie did not fall within the exception for “an independent contractor performing substantial manual labor,” or in the alternative, failing to find Jimmie was an employee of B & B.

DISCUSSION

Although the WCJ’s written reasons for judgment indicate she found there was a lessor/lessee relationship between B & B Farms and M & J Crawfish, and that Jimmie was not an independent contractor performing substantial manual labor, the ultimate finding on which she based her ruling was that Mary failed to prove by a preponderance of the evidence “that Jimmie was working on Larry’s tractor at the time of his death.” Thus, we will address Mary’s second assignment of error first.
The law is clear that the appropriate standard of review to be applied to the WCJ’s findings of fact is the manifest error or clearly wrong standard. Dean v. Southmark Constr., 03-1051 (La.7/6/04), 879 So.2d 112. “[T]he findings of the IsCWCJ] will not be set aside by a reviewing court unless they are found to be clearly wrong in light of the record viewed in its entirety.” Id. at 117.
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court’s finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). “During the four decades which have passed since Canter was rendered, this court has consistently and scrupulously adhered to the rule set forth in that case.” Marange v. Custom Metal Fabricators, Inc., 11-2678 (La.7/2/12), 93 So.3d 1253, 1258.
There is no direct evidence, as Jimmie was alone and is the only person who actually knew what he was working on. There were duck houses and the metal pole stands in the area, as evidenced by the photographs taken by the Evangeline Parish Sheriffs Office. Thus, there is only circumstantial evidence in the record to determine what Jimmie was working on at the time of his death.
In her brief, Mary highlights several instances of this circumstantial evidence. Mary testified that the night before his death, she overheard a telephone conversation between Jimmie and Larry about a canopy for the tractor. Larry testified that he did not remember any conversation with Jimmie the night before the accident. Larry did testify that he and Jimmie had *1148 discussed fashioning a | ¿canopy for the tractor for a few months, as well as performing another repair to the tractor.
Further,’ Mary argues that the reports from the LWCC file state that Jimmie was working on a tractor at the time of his death, but Betty Fontenot, who filled out the report, did not testify, and it is unclear how she received that information. Mary also points to the following conversation with Mitch recorded by Ms. Huffty:
Huffty: Right, and actually your dad seemed to think Jimmie was working on making a parasol stand kinda for his own, for your dad’s tractor at the time.
Mitch: Right, I’m really not sure how they are supposed to be doing that. Uh, I know they did discuss about it, the day before, and uh, that’s what they are, some kind of something to hold an umbrella or something with it.
Huffty: It was an umbrella he said.
Mitch: Right, I don’t know exactly how they do that, but they had talked about it and that was what he was working on.
Huffty: Okay,
Mitch: Uh, I was away from home and uh, I drove up and he was already there. Okay and he was working on some wood duck houses which was his personal use. Okay, he was doin’ for himself because he about to build a house and stuff.
Huffty: Okay.
Mitch: And um, he was going to dig a pond in the back and put some wood duck houses in the pond. He got though .with that and he came inside the house and he just come talked with me a little while and he was still inside my house, you know everything, he was hot, he was wet from sweating and uh, he waited, we talked maybe 10-15 minutes. He walked back outside and I don’t know, I guess maybe 15 minutes later is when I found him.
Mary argues that this conversation is further proof that Mitch knew that Jimmie had finished working on the wood duck houses and had moved on to the tractor | ¡¡canopy. But Mitch stated in his deposition and at trial that he did not know what Jimmie was working on at the time of his death.
Mary also points to a statement in a report from Ms. Huffty in which she says Larry told her that Jimmie was working on a rod for an umbrella for Larry’s tractor. In his deposition and his testimony at trial, Larry stated that, while they had discussed a canopy for his tractor, he did not know what Jimmie was working on at the time of his death.
Mary also points out that the metal pole that Jimmie was welding on at the time of his death had a different base that the metal pole attached to the wood duck houses that had been completed. She argues that this shows that the metal pole was to be used for the canopy for the tractor. There is no evidence in the record, though, as to what the bases for the metal poles on the tractor’ looked like. Furthermore, the tractor that Jimmie would have been attaching this canopy to was not near the area where he was working at the time of his death. It was in the shed where it was normally kept.
This is a tragic case. The WCJ found that Mary did not meet her burden of proving that Jimmie was working on a canopy for B & B Farms’ tractor at the time of his electrocution. Mary testified that she was not there and did not know what Jimmie was working on at the time of his death. Mitch and Larry both testified at trial that they did not know what Jimmie was working on at the time of his death,. While there is some circumstantial evidence that Jimmie was working on a tractor canopy, the record as a whole supports the conclusion that the WCJ’s find *1149 ing of fact on this issue is reasonable. Accordingly, we find no merit to Mary’s second assignment of error. As a result of that finding, the remaining assignments of error are moot.

{¿CONCLUSION

We- affirm the judgment dismissing Mary Granger’s claims. Costs of this appeal are assessed to the plaintiff, Mary Granger.
AFFIRMED.
COOKS, J.,. dissents and assigns reasons.